**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARSHA A. CLAY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 CV 02953 |
| | ) | |
| COOK COUNTY SHERIFF'S POLICE | ) | Judge Matthew F. Kennelly |
| OFFICER WILLIAM WOODS, Star No. 3471, | ) | |
| et al. | ) | |
| | ) | |
| Defendants | ) | **JURY DEMANDED** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD PARTIES AND CLAIMS**

Plaintiff Marsha Clay, by one of her attorneys, Jon F. Erickson, respectfully requests leave to file a 2nd Amended Complaint which adds additional parties and claims. In support of her motion, Plaintiff states as follows:

**INTRODUCTION**

Plaintiff seeks leave to file a 2nd Amended Complaint based on the willful concealment of exculpatory evidence and identities of wrongdoers. Plaintiff, Marsha Clay filed her 1st and 2nd Complaints based upon the versions of events as provided in the reports tendered to her during the criminal case. An August 22, 2011, disclosure of seven 'Use of Force Reports,' two handwritten memorandums, two 'Incident Reports' and a supervisory supplemental report revealed for the first time the true nature of Ms. Clay's claims and the person's responsible for her injuries.

Ms. Clay seeks to return the Cook County Sheriff to its rightful place as a defendant in this case. On May 13, 2010, Marsha Clay filed a *pro se* complaint which named the Cook

County Sheriff as a defendant. The Sheriff was served with a summons and copy of the Complaint by August 30, 2010. (R. 8) ASA Mary McClellan filed an appearance on behalf of the Sheriff on September 16, 2010. (R. 12). An Amended Complaint was filed on November 23, 2010, which by mistake, removed the Sheriff as a named defendant. (R. 25). There was simply a mistake made concerning the identity of the proper party. Ms. Clay seeks to return the Sheriff as a named defendant pursuant Fed.R.Civ.P. 15(C)(1).

## <u>ARGUMENT</u>

### I. ADDITIONAL PARTIES AND CLAIMS

THE DEFENDANTS ARE EQUITABLY ESTOPPED FROM RAISING THE
STATUTE OF LIMITATIONS DEFENSE AS TO ADDITIONAL PARTIES AND
CLAIMS BECAUSE THEY ACTIVELY ENGAGED IN CONCEALING
DOCUMENTS AND THE IDENTITY OF THE WRONGDOERS

Ms. Clay's § 1983 excessive force claim, which accrued on May 28, 2008, is subject to Illinois's two-year personal injury statute of limitations. *Redmond v. Russo*, 1999 WL 446850, 3 (N.D.Ill.) (N.D.Ill.,1999); *Baskin v. City of Des Plaines*, 138 F.3d 701, 703 (7th Cir.1998). There is no question that Ms. Clay is seeking leave to add parties well after the expiration of the relevant statute of limitations. *Id.* However, the doctrine of equitable estoppel should prevent the Defendants from raising the statute of limitations defense because the Defendants took affirmative action to conceal the identity of Deputy Wright as well as the fact that he and Jeremy Tucker used physical force on Ms. Clay and contributed to her injuries. *Shropshear v. Corporation Counsel of City of Chicago*, 275 F.3d 593, 597 (7th Cir.2001) (stating that "[a]ny deliberate or otherwise blameworthy conduct by the defendant that causes the plaintiff to miss the statutory deadline can be the basis for a defense of equitable estoppel in federal limitations law").

"In order to invoke equitable estoppel, a plaintiff must show not only misconduct by the defendants, but also that he actually and reasonably relied on the misconduct." *Ashafa v. City of Chicago*, 146 F.3d 459, 463 (7th Cir. 1998) (citing Hamilton v. Komatsu Dresser Indus., Inc., 964 F.2d 600, 605 (7th Cir. 1992)).

The longstanding principle of equitable estoppel owes its existence to the nature of federal courts as tribunals of justice, *Cange v. Stotler & Co.*, 826 F.2d 581, 587 (7th Cir.1987), and "is wholly independent of the limitations period and takes its life, not from the language of the statute, but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice." *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1070 (7th Cir.1978).

The doctrine of equitable estoppel "is a more generous doctrine than the doctrine of equitable tolling-which adjusts the rights of two innocent parties." *Wheeldon v. Monon Corp*., 946 F.2d 533 (7th Cir.1991). To prove estoppel successfully, the plaintiff must show that the defendant's conduct was improper, and that the plaintiff was harmed by such conduct." Id. at 537. "[I]t is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay." Cange v. Stotler & Co., 826 F.2d 581, 587 (7th Cir. 1987).

In an attempt to cover-up excessive force, Sheriff's Deputies, Michael Quinlan, Tawanda Wilson, Jeremy Tucker, Arthur Wright and Sergeants Dillon and Rhodes, conspired to maliciously prosecute Ms. Clay for aggravated battery against Deputy Quinlan. They conspired to conceal the exculpatory Use of Force Reports and the identity of the wrongdoers. The Defendants should be barred from asserting the statute of limitations defense by equitable estoppel, *Shropshear v. Corporation Counsel of City of Chicago*, 275 F.3d 593, 597 (7th

Cir.2001), and the discovery rule. *Moore v. Morales*, 415 F.Supp.2d 891, 895, 415 F.Supp.2d 891

**"Perpetuating the Darkness"**

**a. Deputy Wright—Excessive Force**

By any measure, Deputy Wright played a major role in Ms. Clay's arrest and injury. By his own admission, he used physical force to lift the handcuffed Clay off the courtroom floor and forcibly carried her through the courtroom and up two floors to the 5th floor Sheriff's arrest room. Exhibit 1. Marsha Clay's injury was severe and rendered her unable to walk.

Two Sheriff's Investigators and a Sheriff's Police Sergeant (Sgt. Dillon) were assigned to investigate and document the aggravated battery. Deputy Wright's name does not appear in a single Sheriff Investigator's report, narrative or handwritten progress note. Exhibits 2, 3, 4. Deputy Wright is not included in any resulting list of witnesses, including Sgt. Dillon's Exhibit 2. Six other Sheriff's deputies completed Use of Force Reports contemporaneous with this incident. Not one of them mentions Deputy Wright. Exhibits 5 thru 12.

Marsha Clay's injury was severe and required emergency surgery, yet Ms. Clay's injury is not described, explained or mentioned in any of the narratives or handwritten progress notes— including Sgt. Dillon's. Exhibit 2.

Deputy Wright authored a Use of Force Report on the day of this incident that indicates that he used "physical force" when Marsha Clay "was handcuffed on the floor as R/O approached." Exhibit 1. He describes an "assailant" who "refused all verbal commands and indicated she wasn't going to move. R/O used force necessary to carry Marsha Clay to 5th floor

4

arrest room."[1]  Id.  This document was approved and signed by Wright's supervisor, Sergeant

Monica Rhodes.  Id.  This document was concealed from Ms. Clay until August 22, 2011.

Prior to the August 22, 2011 disclosure,  the only written mention of a Deputy Wright

was an unsigned, undated, untitled, handwritten note that appears to be the second page (there is

no first page) of an unidentified report which merely states that "…R/O got to courtroom and

saw female later identified as Marsha Clay handcuffed on the floor.  R/O assisted female to

arrest room on 5th floor."  Exhibit 13.

The only testimonial mention of Deputy Wright prior to the August 22, 2011 disclosure

came during the April 25, 2011, deposition of Defendant Sergeant James F. Dillion.  Dillon was

shown the unsigned, unidentified note and said: "There's no date, but at the time he [Wright]

said he assisted Marsha Clay to the arrest room on the fifth floor." Dillon at 149, line 7.

Defendant Dillon went on to say that he didn't recall seeing the document before April 25, 2011.

Dillon at 154.  Prior to the discovery of the hidden documents, not one document, narrative or

witness account mentioned any "use of force" on Ms. Clay at all, much less by Deputy Wright.

Dillon also testified that there were no reports that would indicate who handcuffed Ms. Clay or if

she was handcuffed.  Dillon at 113.

 The phantom, handwritten report used the word "assisted" while the Use of Force Report

used the phrases "used force necessary to carry," "physical force" and "assailant."  The word

"assisted," which seems to be the settled upon 'talking point,' was even used by Defense

Counsel when she asked Sgt. Dillon to about the nature of Wright's involvement:

Q: And does it [this document] indicate some type of involvement that occurred on the

date in question of this incident?

---

[1] Ms. Clay was not charged with resisting/ obstructing a peace officer or disorderly conduct.

A: There's no date, but at the time he said he assisted Marsha Clay to the arrest room on the fifth floor.

Q: So based upon this information, you would have – would it be fair to say that Mr. Wright is providing a report saying that he assisted Ms. Clay from the courtroom where he found her in handcuffs up to the fifth floor arrest room?

A: Yes.

In light of the missing reports, there is nothing fair about that characterization at all; "assisted" is actually an unfair and misleading representation of what occurred and of Deputy Wright's involvement. Deputy Wright did not act like a friendly orderly in a senior center assisting an elderly woman into bed. He used physical force to lift an "assailant" off the floor and carry her to the 5th floor arrest room. Exhibit 1.

During the course of discovery in the § 1983 case, Ms. Clay deposed Sgt. Dillon, Deputy Michael Quinlan, Deputy Lynette Flowers, Deputy Tawanda Wilson, Deputy William Woods, Deputy Jeremy Tucker, Sgt. Monica Rhodes and Cook County State's Attorney's Office Victim/Witness Specialist Yolanda Elizondo. Only Deputy Wilson testified that Deputy Wright was present during this incident—and this was after the disclosure of the concealed reports.

This was a ring of silence. It was designed to remove an entire character and series of events from this story and "prevent a potential claimant from learning the identity of the wrongdoer." Critical evidence was actively and fraudulently concealed from Ms. Clay and prosecutors to protect Deputy Wright and the Cook County Sheriff from liability and benefit from a statute of limitations. "The conduct was directed to the very point of obtaining the delay of which the Defendant seeks to take advantage." 51 Am.Jur.2d Limitation of Actions § 438, at

904 (1970). The silence was designed to "perpetuate the darkness." *Davis v. Frapolly*, 742 F.Supp. 971, 975 (N.D.Ill.,1990).

### b. Deputy Jeremy Tucker – Excessive Force

Deputy Tucker was interviewed by Cook County Sheriff's Police Investigator C. Plybon, #253 on May 28, 2008. Exhibit 3. This version was tendered to Clay. During that interview Deputy Tucker stated that when arrived to Room 307, he observed three female blacks in the courtroom yelling at deputies and "had the three female blacks place their hands on the wall." Exhibit 3. He stated that "one of the subjects (Clay, Marsha) was refusing to comply as instructed and became argumentative." "Tucker along with D/S Wilson handcuffed the Clay without further incident." Id.

In contrast to the official, tendered version, Deputy Tucker's concealed Use of Force Report refers Marsha Clay as an "assailant" and that he used "physical force." Exhibit 5. The concealed document says he "Clay, Marsha became combative and attempted to strike Sgt. Nickels. R/O engaged subject and detained subject until D/S Wilson, T. #3755 was able to handcuff her. Subject complained of an injury to her leg and was given medical attention by CPD paramedics. Subject was transported to Cook County Hospital for treatment." Exhibit 5. This document, like the hidden Wright document was approved and signed by Tucker's supervisor, Sgt. Monica Rhodes.

Deputy Tucker gave yet a third version during his deposition which occurred before the disclosure of the hidden reports. He testified that he does not remember creating any reports. Tucker at 59, 62. He testified that he remembers no other officers who were present other than Deputies Woods, Quinlan and Wilson. *Id*. at 101. He testified that he never saw Ms. Clay hit anyone, including Deputy Quinlan. Id. at 107. He testified that he doesn't recall seeing Deputy

Quinlan in the courtroom on May 28, 2008.  Id. at 114.  He testified that he doesn't remember which officers were around Ms. Clay when he entered the courtroom.  Id. at 69.  He testified that Ms. Clay was not committing any crimes when he cuffed her, *Id*. at 60, 65, 143, and she was only cuffed for her own safety and the safety of others. *Id*. at 66.  He testified that he did not recall if he learned of Ms. Clay's injury "on the day of the incident or later on."  Id. at 110.  He testified that no one ever asked him how Ms. Clay's knee was injured or if she was injured when he cuffed her.  *Id*. at 110.  He testified that he did not learn of "an allegation that Marsha Clay had struck Officer Quinlan in the throat until [he] appeared for the criminal trial."  Id. at 141.

The contradictions in Tucker's three versions go well beyond inconsistencies.  The differences between each of the versions speak for themselves, but they clearly tell very different stories.  The first story was deemed suitable for disclosure, the second was buried by Sgt. Rhodes and the third was created by Tucker while under oath.

### c.  Tawanda Wilson – Malicious Prosecution, Excessive Force, Due Process

Deputy Tawanda Wilson was the State's only alleged corroborating eye-witness to the aggravated battery.   Wilson gave an official version which was tendered to Clay. Exhibit 2.  Deputy Wilson authored a Use of Force Report and a handwritten memorandum which were withheld from prosecutors and Clay until August 22, 2011. Exhibits 6, 7.

In the tendered report Wilson told Sgt. Dillon that she was seated in the jury box when the judge rendered his verdict of not guilty.  Exhibit 2.  Deputies Flowers, Deputy Quinlan, Rhodes and Woods all testified that Wilson was not in the jury box for the verdict.  Flowers at 25, 38;  Quinlan at 45, 50: Rhodes at 16,17,20; Woods at 59, 62, 63.

The official version states that at the time of the verdict "two male blacks "jumped up and stated "fuck this shit."" Exhibit 2.  However, Flowers, Quinlan, Rhodes and Woods all testified

that there was little or no reaction from the gallery when the verdict was read, Flowers at 34, 47, 48; Quinlan at 53, 54; Rhodes at 66; Woods at 63, 64, 67 and that all remained seated. Quinlan at 53, 54; Rhodes at 66; Woods at 63, 64, 67

More fatal to Wilson's version-- it is impossible to see into the gallery from the jury box because the interior glass wall which faces the well of the courtroom is wholly reflective. Exhibit 21.

In the unconcealed version Wilson told Sgt. Dillon that Deputies Woods and Ramos were attempting to handcuff Antwand Brown when "they fell into the courtroom." She said that "at that time," Quinlan was in the gallery with Marsha Clay and another black female, when Clay struck Quinlan "in the neck and head several times." Exhibit 1. In reality, she saw none of this because of the interior reflective glass. Exhibit 15.

Further, Quinlan says Clay was seated sideways on the second bench in the gallery, with her legs straight out in front of her, when she punched him in the neck. Quinlan at 154. Deputy Quinlan testified that Tawanda Wilson was *entering the gallery from the hallway door* when he was struck in the neck—that Wilson's entrance is what caused him to take his eye off Clay. Id. at 154.

These versions cannot be reconciled; Wilson could not have been in the well of the courtroom and entering the gallery from the hallway at the same time. Exhibit 15. And Sgt. Rhodes and Deputy Woods both testified that Quinlan wasn't in the gallery during the struggle with Antwoine Brown. Rhodes at 103, 104, 121; Woods at 77, 78.

These versions destroy Wilson's credibility, but it is Wilson's concealed Use of Force Report that would have illustrated her lack of credibility to prosecutors and Clay. Exhibit 6.

For example, Deputy Wilson's concealed Use of Force Report claims that Ms. Clay "jumped on D/S Quinlan's back grabbing his throat." Exhibit 6. The concealed report says "that [Wilson] attempted to place Clay in custody" and Clay "then turned and attempted to kick" Wilson, but missed kicked the bench. *Id.* This document not only solidifies that Wilson is lying, it is the only acknowledgment that Clay was injured in the gallery or that offers some explanation as to how she was injured. Id.

The other concealed Wilson document was a handwritten memo directed to the Chief of the Building, which claims that when the "Judge rendered a not-guilty verdict the victim's family became disruptive," so she "took a position at the courtroom door" and that after Woods and Ramos apprehended Brown, she and Rhodes secured the courtroom doors [from inside] to prevent the victim's family from entering causing further disruption." Exhibit 7. She says that "at this time," she observed Deputy Quinlan "attempting to place a male black in custody" when Marsha Clay "jumped on D/S Quinlan's back." Wilson says she assisted Quinlan and "attempted to detain the offender" and Clay she attempted to kick Wilson and kicked the bench. "Offender was subdued and placed into custody." Id.

When asked about Wilson, Sgt. Rhodes said *Wilson did not see this occurrence at all* and did not help hold the doors shut, because she had taken the defendant back to the lock up. Rhodes at 111, 152. Rhodes further says that Quinlan wasn't in the gallery during this this time, Id. at 105, 106, 121.

Deputy Rhodes' testimony makes Tawanda Wilson's and Deputy Quinlan's versions impossible. According to Rhodes, Wilson didn't see Clay hit Quinlan because Wilson was not there. And Quinlan heard Rhodes' "all available" call while he was outside of the courthouse

and he hadn't returned when Rhodes determined the situation was under control and left for the 5th floor arrest room. Id.; Quinlan at 75

As incredible as each of these versions are, they were withheld from Ms. Clay. They demonstrate that Wilson and Quinlan are lying about the aggravated battery. And astonishingly, these reports only scratch the surface of Tawanda Wilson's propensity for fiction.

Deputy Tawanda Wilson gave a deposition after the hidden documents were discovered. During her deposition she gave a version in great contrast to her reports, the investigator's reports and the sworn testimony of every other witness. After hours of detailed testimony she was shown her concealed reports by Defense Counsel. Suddenly, she told a wholly different version—a version that feebly attempted to reflect the concealed reports.

Deputy Wilson testified that she was seated in the jury box when the judge gave his verdict and the courtroom "went up." Wilson at 21, 22. People started screaming and yelling, Id. at 21. Two boys [Clay's son's] who were on the defendant's side of the courtroom, Id. at 28, stood up and began yelling and screaming. Id. at 25. She says that at that time she was able to see into the gallery and that the Clay family was seated on the defendant's side of the gallery. Id. at 23, 24.[2] She testified that there is no reflection from the inside glass wall. Id. at 23, Exhibit 21.

Moments later, when she returned to the courtroom, the Clay family "was like wild animals; they were uncontrollable." Id. at 11. She says she saw Deputy Rhodes holding the door shut while two girls were trying to pull them open and get inside the well of the courtroom. Id. at 16, 18, 82, 83. Wilson went to the glass doors to help Sgt. Rhodes hold the doors shut, because Rhodes "really couldn't keep the door closed." Id. at 31.

---

3 Every other witness has testified that the defendant's family was seated on the defendant's side and that the victim's family was seated on the victim's side.

During this time, two of Clay's sons were beating up Deputy Quinlan. Id at 35. Quinlan was on top of one son "like doggy-style," trying to cuff him, while another was on his back, "beating his butt," "hitting and pulling," "hitting him in the head and punching him with his fists." Id. at 15, 35, 37, 38, 39, 42, 89. Sgt. Rhodes then made the "all available call" because the Clay boys were beating up Quinlan. Id. at 31, 34. She says she and Rhodes stood at the glass doors watching Quinlan get beaten up for a minute. Id. at 48, 85.

She says that during this time Marsha Clay was "standing on a bench kicking Quinlan" in the head repeatedly; "she just kept kicking." Id. at 12, 13, 14, 15, 17, 43, 44, 48, 66, 70, 71, 79, 106, 145. She testified that Clay kicked Quinlan in the head for about two minutes. Id. at 14, 86.

It was about this time, according to this new version, that Deputy Woods and the security team entered the gallery from the wooden hallway door. Id. at 48. She said she watched Deputy Woods enter the gallery from the hallway, travel towards the glass door up the aisle-way, then turn right down in front of the first bench, travel the length of the bench to the front corner and pull the Clay son off Quinlan's back. Id. at 52, 73, 76, 77, 80, 81, 82, 88. After Woods pulled Clay's son off of Quinlan, the son turned around and "socked Woods in the face. Id. at 85. According to Wilson, Clay's son punched Woods approximately fifteen (15) times and Woods backed up along the row towards the aisle. Id. at 97, 99, 103. Clay's son then "threw" Woods into the courtroom and Woods came flying through the courtroom doors and fell into the courtroom backwards. Id. at 93, 94, 103, 105. According to Wilson, the "deputies were getting beat up real bad" – "the Clay sons were winning." Id. at 96.

Wilson testified that she was still holding the glass doors from within when Woods was thrown into the courtroom. Id. at 76, 77, 78. She said she had to step out of the way. Id. at 78. When asked what happened to the two girls that were trying to pull open the glass doors she said

they "vanished." Id. at 53. When Woods burst through the door, he and Clay's son "flew over the tables." Id. at 94. No one was assisting Woods at this time. Id. at 106, 107.

Wilson said she continued to hold the doors for another minute with Rhodes after Woods burst through the doors. Id. at 85. Wilson says that Sgt. Rhodes then ordered Wilson into the gallery so she went in the gallery "to tell the lady come down from that bench." Id. at 45, 79.

Wilson entered the gallery, walked towards Clay and Clay jumped off the bench as Wilson approached. Id. at 63, 64, 65. Clay jumped in the space between the far end of the bench and the wall, landed on her feet, and said "Ah," "I'm hurt; I hit my knee on the bench." Id. at 63, 64, 65, 70, 108, 109. Clay did not fall and Wilson testified that she saw no other way that Clay hurt her knee." Id. at 109. Wilson said, "come from around there," and Clay "limped" around the bench while holding her right knee, and sat on the second bench. Id. at 110, 111. Wilson does not explain what happened to Quinlan after Clay jumped off the bench.

According to this version, Clay remained seated on the bench and refused to get up. Id. at 112. Wilson says Deputy Arthur Wright said "come on, I'll carry you" and Clay said "Okay." Id. at 114, 117, 120. Wilson said she thought Clay was faking her injury to avoid "going to jail for kicking the deputy in the head." Id. at 115, 131. They did not try to cuff Clay because "cause she was just sitting down" and holding her knee. Id. at 117, 118, 119. Wilson says she took Clay by the arm and attempted to get her to stand up and Ms. Clay said, "I can't." Id. at 119. Deputy Wright picked her up and carried her to the 5th floor. Id. at 120, 134. Wilson said Wright "cradled" Clay and agreed that Wright carried Clay "like they were walking through a threshold on a honeymoon." Id. at 134, 135. She says that Wright was very nice to Clay and that Clay even said "thank you" when he put her back down on the 5th floor. Id. at 177. She said

Clay was not handcuffed and had Clay one arm up around his neck, "holding on to it." Id. at 135.

Wilson testified that the only contact between Clay and Quinlan was the kicking and she doesn't remember seeing Clay grab Quinlan's throat. Id at 145, 146, 148. She testified that she doesn't remember Clay trying to kick her or jump on Quinlan's back. Id. at 146, 147, 148. She also said she doesn't remember seeing Marsha Clay on the floor. Id. at 148. These questions did not refresh her recollection of any of these allegations. Id. at 145, 146, 147, 148.

Then Defense Counsel showed Deputy Wilson the Use of Force Report and memorandum that were withheld from Clay. Suddenly Deputy Wilson's account of events changed yet again. Now Wilson returned to the version where Clay injured herself by kicking the bench in an attempt to kick Wilson – yet, astonishingly she clings to her story that Clay hurt her knee by jumping off the bench. Id at 165, 190. Now she says that Clay was on Quinlan's back holding his throat. Id. at 170. Now she says that Clay was handcuffed when she was carried to the 5th floor, but still had her arm around the deputy's neck. Id. at 170, 171. Now she says that when she returned from the lock-up Woods was with one Clay boy, Quinlan was with another, and Clay was on Quinlan's back. Id. at 180.

She now says the first thing she did was go directly to the gallery to help Quinlan—"I got Clay off Quinlan's back." Id. at 183. Then she said she didn't get her off Quinlan's back but said "hey, and she got up and she tried to kick me 'cause I was coming toward her." Id. at 183.

In her latest version Wilson said she didn't enter the gallery right away but joined Rhodes at the glass doors." Id. at 184, 185. Then she said she didn't see Clay jump on Quinlan's back because there were three different fights going on in the gallery when she came back from the lock-up. Id. at 185. Then she said she saw Clay jump on Quinlan's back. Id. at 186.

After she saw the reports she said that Clay was standing on a bench and then just jumped on Quinlan's back.  Id. at 186.  And then "she jumped off his back and tried to kick."  Id. at 187.  Then she said Clay jumped off the bench and said, "Ah, I hurt my knee."  Id. at 189.   Then she went back and forth between versions claiming Clay jumped off Quinlan's back and jumped off the bench. Id. at 187-191.  Finally, a bewildered Plaintiff's Counsel asked:

Q:  And it's your testimony she [tried to kick you], missed and she hit her knee on the bench, right?

A:  Yes.

Q:  And you're saying that when she jumped off the bench, she said, "Ah, I hurt my knee." Right?

A:  I don't know how she did it.  I wasn't paying attention to the women.

Q:  Ma'am, I just – I asked you –

A:  Really I'm not – I didn't – I wasn't paying attention to the woman.  I didn't care actually.

Deputy Tawanda Wilson is not telling the truth about what occurred on May 28, 2008.  She was not telling the truth in her Use of Force Report, in her memo, in her interview with investigators or at her deposition.   She was the State's only corroborating witness to Quinlan's claim.  Sgt. Rhodes concealed her Use of Force Report and handwritten memo from prosecutors.  Had prosecutors been aware of the extent of Wilson's and Quinlan's false testimony and had seen the extent to which Wilson's Use of Force Report and memo impeach Quinlan, they would have seen the irreconcilable differences between Wilson's and Quinlan's versions.  They would not have approved felony charges.  Tawanda Wilson testified that she learned of this law suit during the criminal case.  Id. at 156.

### d. Lynette Flowers—Malicious Prosecution, Due Process

The report that contains Deputy Lynette Flower's official version says that she was present in courtroom 307, when "a group of family members located in the gallery area began yelling at deputies after Judge Ford rendered a non-guilty (sic) verdict" Exhibit 3. Flowers observed two male, subjects becoming more agitated and refusing to comply with orders given by deputies. Flowers then observed one male subject (now known as Antwand Brown) fighting with D/S Woods and D/S Ramos in the gallery." Id. The tendered version says that "Flowers did not see how the fight started. Id. "Moments later Brown, D/S Woods and D/S Ramos entered the courtroom and fell over a table. Brown was then handcuffed. Numerous other family members in the gallery began yelling at the deputies and refusing to comply with instructions. Flowers entered the gallery and escorted two unknown female, black subjects out of the courtroom." Id.

Flowers authored a handwritten memorandum contemporaneous with this incident which states that after a not-guilty verdict while waiting for clearance for the victim's family to leave the gallery, the Clay family "started to get very vocale (sic) and hostile." The concealed report claims that "one male black (now known as Anton Brown) continued to be hostile and shoved D/S Woods. After that D/S Woods attempted to place him into custody and the family became combative and additional help was called by D/S Wilson. R/D escorted two non hostile male family members in the hall where they stayed until additional help arrived." Exhibit 8.

In direct conflict with both her official version and the concealed version, Deputy Flowers testified on August 4, 2011, that there was no reaction, no up-roar, nothing unusual and no swearing in the courtroom when the verdict was given. Flowers at 34, 37. She testified that

she took the defendant to the lock-up and didn't return to the courtroom until after the entire incident was over. Id. at 36, 47, 48, 66, 71, 72, 84.

Again, these versions are irreconcilable. She led investigators to believe that she witnessed these events and that members of the Clay family were agitated, combative and non-compliant when, according to her sworn deposition testimony, she didn't see a thing.

### e. Sgt. Rhodes – Malicious Prosecution, Due Process

Sgt. Rhodes' approved and signed each of the concealed Use of Force Reports. Exhibits 1, 5 - 13.. Each of the Use of Force Reports and memos were given to her by the author at after they were completed. It was her responsibility to hand them up the "chain of command." Sgt. Rhodes authored a supervisor's report. These were the only documents that revealed a use of force on Marsha Clay and the only reports that attempted to describe how Clay was injured. These documents impeach the versions given to investigators. Each of these critical documents was withheld from prosecutors. Each was withheld from Marsha Clay until August 22, 2011.

Sgt. Rhodes testified at her August 8, 2011, deposition that the only report that was created was a general incident report. Rhodes at 11. She said that at no time did she review and reports regarding this incident. Id. at 11. She testified that she doesn't remember signing off on any reports and doesn't know which officers created "To/Froms." Id. at 12. Near the end of her deposition she testified that she created a supervisor's log and that she gave it to her lieutenant that day. Id. at 142, 143.

Defense Counsel told Plaintiff's Counsel by way of email that, "These are for the first time they are documents you requested and Sgt Rhodes had in her possession as Sgt." Defense Counsel said they were not in Rhodes personal possession, "in her file." Exhibit 16. Defense

Counsel said she "requested same from legal (sic) However Sgt Rhodes indicates she maintained a copy of all reports she signs off on and that is what I have produced" Id.

Sgt. Rhodes concealed material evidence from prosecutors and Ms. Clay. The fraudulently concealed Use of Force Reports, particularly Wilson's, wholly impeach the alleged victim's version, identify Wright and Tucker, acknowledge a use of force on Clay and corroborate Ms. Clay's version of events. They were subpoenaed by the State's Attorney's Office at the outset of the criminal case, but not turned over. Exhibit 17. Marsha Clay explicitly asked for exculpatory evidence and witnesses in her written Motion for Discovery at the outset of the criminal case, but they were not turned over. Plaintiff's Counsel requested Officer Wood's Use of Force Report, on the record, during Woods' July 13, 2011 deposition, but it was not turned over. Woods at 15.

### f. Deputy Quinlan – Due Process

Deputy Quinlan, the alleged victim of the aggravated battery provided false inculpatory evidence to investigators, prosecutors and during his deposition in this case. He did so to initiate false charges against Ms. Clay, to prevent exculpatory evidence from reaching Ms. Clay during her criminal case and to conceal the identities of the Sheriff's employees who caused Ms. Clay's serious and permanent injuries.

Quinlan's official version, contained in reports tendered to Clay, indicate that he was present for the not-guilty verdict and that he, along with Woods and Ramos, "stepped between the families." Exhibit 4, p. 2. Rhodes and Woods say Quinlan wasn't present for the not-guilty. Rhodes at 103, 104, 121; Woods at 77, 78.

The version provided to Clay says Quinlan escorted the defendant's family out of the building, heard the "all available" and sprinted back to the courtroom where "it was like a riot."

18

Exhibit 4.   He said he saw Woods cuffing a black male on the courtroom floor and witnessed numerous family members jumping over the benched in the gallery yelling and screaming.  He said he tried "to control a B/F trying to enter the gallery and gets struck in the throat by a closed fist or elbow."  Id.  The version provided to Clay and prosecutors say that he "couldn't catch his breath so he stepped inside the courtroom from the gallery to help hold the doors shut so family members couldn't rush the judge."  Id.  He said that "at that time more deputies arrived and used minimal force to control the situation."  Id.

Quinlan's deposition testimony told a different story altogether.  In this version he said that there was no reaction to the verdict and that all family members remained seated.  Quinlan at 53, 54.  He said that when he returned from escorting the defendant's family out of the building there was no one in the gallery except a lady with a baby on the far left side of the gallery.  Id. at 88.  He said the only deputies he saw when he entered the gallery were Woods and Ramos, who were in the courtroom.  Id. at 90.

After Quinlan gave this wholly contradictory to the official version, Defense Counsel requested a break.  Id. at 102.  When the deposition resumed, Quinlan reversed his testimony and now said swore that there were in fact more people in the gallery, and that he could see into the gallery when he was getting up from assisting Woods and Ramos.  Id. at 102.

We know that Quinlan could not have seen into the gallery from his alleged vantage point (Exhibit 21) and Woods, Rhodes and Wilson say he didn't assist in cuffing Brown.  Rhodes at 103, 104, 121; Woods at 77, 78.

In Quinlan's post-break testimony, he claimed to have "maintained a visual" on Clay as he stood up, walked around the defense table and entered the gallery.  Quinlan at 107.  Again, a claim rendered impossible by the mirrored interior glass wall.  Exhibit 15.

He testified that while he maintained this "visual" he saw Marsha Clay climbing from one bench to another and finished her climb when he entered the gallery. Quinlan at 111.

Most incredibly and for the first time anywhere or to anyone Quinlan says that when he told Clay to get down from the bench, Clay began to hit him in the head with her high-heeled shoes. Id. at 114, 115, 116, 117, 118, 119, 120, 123, 124. He says she hit him on the crown of his and on his shoulder while swinging the shoes with one in each hand. Id.

He testified that he never told investigators, his supervisors, fellow deputies or prosecutors about being attacked by the high-heeled shoes. Id. at 124. No shoes were inventoried or mentioned by any other witness.

He approved the criminal complaint which states that Clay struck him "in the head and neck with her fist and elbow." Exhibit 18. The Cook County State's Attorney's Felony Minute Sheet says that "Clay struck Michael Quinlan about the body." Exhibit 19.

Deputy Quinlan testified that Tawanda Wilson was entering the gallery from the hallway door when he was struck in the neck by Clay —that Wilson's entrance is what caused him to take his eye off Clay. Id. at 154. He testified that after he was struck he entered the well of the courtroom and vomited in a wastebasket. Id. at 159.

Like each of the other witnesses, his sworn deposition testimony tells a wildly different story than the official version tendered to prosecutors and Ms. Clay during the criminal case. Unlike the other witnesses, Quinlan claimed to be the victim of an aggravated battery.

**Reasonable Reliance**

In reasonable reliance on the discovery tendered by the State, Ms. Clay's criminal defense attorney was able to secure photos of seven of the Sheriff's deputies disclosed as occurrence witnesses in the aggravated battery case. Exhibit 20. This photo array did not

include a photo of Deputy Wright. This defective, misleading photo array was shown to Ms. Clay in an attempt to identify the Deputy who threw her to the ground and dragged her by her ankle and violently carried her to the 5th floor. Based on the photo array, Ms. Clay identified Deputy Woods.

Ms. Clay reasonably relied on the misinformation and misdirection that was disclosed to her in the criminal case when she drafted and filed her *pro se* complaint. Ms. Clay was forced to rely on this misinformation when she filed her 1st Amended Complaint. Ms. Clay relied on this misinformation when she propounded her written discovery and deposed the witnesses.

The concealed Use of Force Reports were tendered to Ms. Clay five days after the expiration of the only remaining unexpired statute of limitations--her malicious prosecution claim. The suspicious timing of the disclosure clearly hindered Ms. Clay from obtaining the information necessary for the protection of her rights. *Smith v. City of Chicago Heights*, 951 F.2d 834, 840 -842 (C.A.7 (Ill.),1992). Ms. Clay reasonably relied on the misinformation when she watched her final statute of limitations sail by.

### g. Due Process

Police officers who withhold exculpatory evidence from prosecutors or fabricate inculpatory evidence similarly violate the due process clause and are subject to suit under § 1983. *Newsome v. McCabe*, 256 F.3d 747, 753 (7th Cir.2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir.1988). In *Carroccia v. Anderson*, 249 F.Supp.2d 1016, 1017 (N.D.Ill.2003), this Honorable Court declined to dismiss a due process claim where the criminal defendant was aquitted. In *Carrocia v. Anderson*, this court noted:

> Pressure must be brought to bear. Prosecutors kept in the dark by police ... won't improve
>
> their performance with or without legal liability for their conduct. Requiring culpable

officers to pay damages to the victims of their actions ... holds out promise of both

deterring and remediating violations of the Constitution. *Id.*

Although Clay's criminal charge was dismissed short of trial, the reasoning is the same.

The "deterrent argument applies equally to police who successfully and unsuccessfully attempt

to frame innocent defendants." *Kidd v. City of Chicago*, L 22243938, 1 -2 (N.D.Ill.,2003. A

prosecutor's or police officer's compliance with *Brady* does not turn on whether the defendant

ultimately is convicted. *Carroccia v. Anderson*, 249 F.Supp.2d 1016, 1023, 249 F.Supp.2d 1016

(N.D.Ill.,2003); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, The question is whether, at the

time the evidence is concealed, it could be expected to affect the outcome of the case. *Carroccia*

*v. Anderson*, 249 F.Supp.2d 1016, 1024, 249 F.Supp.2d 1016 (N.D.Ill.,2003).

The defendants in this case withheld exculpatory evidence to affect the outcome of the

criminal case. Ms. Clay faced these fabricated charges for almost 2 years. She was deprived of

her liberty when she was jailed for 14 days and was limited to the confines of the State of Illinois

for the duration of her case.

## CONCLUSION

Judge Norgle summed up the issue well in *Davis v. Frapolly* when he wrote: "Statutes of

limitation were designed to promote the prompt resolution of claims with the recognition that as

a consequence certain meritorious claims would occasionally be barred. Yet, to apply the statutes

of limitation blindly … would have the inevitable effect of encouraging improper conduct. Those

who may benefit from a statute of limitation can have no part in preventing a potential claimant

from learning their identity. They may hide in the darkness caused by the potential plaintiff's

lack of knowledge of their identity.   But they cannot, through acts or omissions, in any way

perpetuate the darkness." *Davis v. Frapolly*,  742 F.Supp. 971, 742 F.Supp. 971 (N.D.Ill.,1990)

The discovery rule "postpones the beginning of the limitations period from the date when

the plaintiff is wronged to the date when he discovers he has been injured." Moore v. Morales,

415 F.Supp.2d 891, 895, 415 F.Supp.2d 891.

In an attempt to cover-up excessive force, Sheriff's Deputies, Michael Quinlan, Tawanda

Wilson, Jeremy Tucker, Arthur Wright and Sergeants Dillon and Rhodes, conspired to

maliciously prosecute Ms. Clay for aggravated battery against Deputy Quinlan.  They conspired

to conceal the exculpatory Use of Force Reports and the identity of the wrongdoers in order to

defeat the relevant statutes of limitations.   The Defendants should be barred from asserting the

statute of limitations defense by equitable estoppel, *Shropshear v. Corporation Counsel of City

of Chicago*, 275 F.3d 593, 597 (7th Cir.2001), and the discovery rule. *Moore v. Morales*,  415

F.Supp.2d 891, 895, 415 F.Supp.2d 891

As a result, Ms. Clay should be granted leave to file a 2nd Amended Complaint which

adds parties and claims and re-names the Sheriff as a defendant.  The Defendants should be

barred from asserting a statute of limitations defense based upon to equitable estoppel and the

discovery rule.

Respectfully Submitted,


/s/ Jon F. Erickson

Jon F. Erickson
One of Plaintiff's Attorneys



Jon F. Erickson
Erickson & Oppenheimer, Ltd.

23

217 N. Jefferson, Suite 100
Chicago, IL 60661
312-327-3370

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certify that on October 20, 2011, a copy of this

Certificate of Service along with the attached pleading was served on counsel of record via the

Court's electronic filing system.

/s/ Jon F. Erickson

Jon F. Erickson
One of Plaintiff's Attorneys

Jon F. Erickson
Erickson & Oppenheimer, Ltd.
217 N. Jefferson, Suite 100
Chicago, IL 60661
312-327-3370